# IN THE SUPREME COURT OF TEXAS

No. 18-0721

TEXAS DEPARTMENT OF CRIMINAL JUSTICE, PETITIONER,

v.

CESAR RANGEL, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Argued November 6, 2019**

JUSTICE LEHRMANN delivered the opinion of the Court.

The Texas Tort Claims Act waives governmental immunity as to claims for personal injury proximately caused by a governmental unit's use of tangible personal property, but the waiver does not apply in certain situations. In this case, a Texas Department of Criminal Justice prison guard fired a skat shell at a group of inmates in a prison dormitory, injuring the plaintiff. Department officials had authorized and instructed the guard to use the tear-gas gun and shell in response to two groups of inmates who had threatened each other and refused to comply with orders from multiple prison officials for almost an hour. On appeal of the trial court's denial of the Department's plea to the jurisdiction, we are asked to determine (1) whether a governmental unit "uses" tangible personal property by authorizing and instructing its use for a given purpose and (2) whether, in these circumstances and at this procedural juncture, one or more of the Tort

Claims Act's exceptions for riots, emergencies, and intentional torts bar a claim for which the Act would otherwise waive immunity. The court of appeals answered yes to the first question and no to the second. While we agree that the Department "used" tangible personal property by authorizing and instructing the prison guard to use it for a given purpose, we hold that the riot exception applies and, therefore, that the Tort Claims Act does not waive the Department's immunity for the plaintiff's claims against it. Accordingly, we reverse the court of appeals' judgment and dismiss the claims for lack of jurisdiction.

## I. Background

The Texas Department of Criminal Justice runs The Pam Lychner State Jail in Humble, Texas. At approximately 10:30 p.m. on May 19, 2015, a group of about thirty inmates in a jail dormitory refused to "rack up"—or proceed to their beds for the nightly inmate count—after Department officials ordered them to do so. One of the officers in the dormitory requested a supervisor to assist with the situation. Lieutenant Cody Waller, the highest-ranking security officer in the facility, and three other Department employees responded. Waller ordered the inmates to rack up, and they complied. Waller and the other Department employees who responded to the call then returned to their regular duties.

Approximately thirty minutes later, twenty-six inmates left their bunks and refused to return to them. The inmates divided into two groups ("Group A" and "Group B") that were at odds with each other, and each group consisted of thirteen inmates who positioned themselves on opposite sides of the dormitory. One of the officers in the dormitory called for a supervisor again, and Waller and three other Department employees responded to the call. When they arrived, the two groups of inmates were yelling profanity at and threatening each other. Waller and another

2

Department employee ordered the inmates to return to their assigned bunks, but the inmates refused to comply and continued to yell at and threaten each other.

In response, Waller ordered another Department employee, Sergeant Robert McLaughlin, to retrieve a camera and, as a show of force to gain compliance, a 37mm tear-gas gun. At that time, Waller did not intend to fire the tear-gas gun, knowing that he could not fire it without first "making a call to the Duty Warden to obtain the authorization to use it." McLaughlin went to the Department's armory and requested a 37mm tear-gas gun, which another Department employee issued. Although McLaughlin did not request a specific type of munition, the armory issued two shells: a "muzzle-blast" round that discharges a puff of gas and a "skat shell" that launches five pyrotechnic submunitions that are designed to deliver chemical agents at a range of up to eighty meters.

While the muzzle-blast round could be used indoors, the skat shell was designed for outdoor use only, as the Department notes that the skat shell has "fire producing capabilities" and its product description states that "[s]erious injury or death may occur if the [shell] is misused." As a result, Department policy required that all skat shells be labeled clearly to warn employees to use those shells only outdoors. However, the warning label on the skat shell issued to McLaughlin had been smeared off.

While McLaughlin retrieved the tear-gas gun and shells, the inmates grew more unruly. Waller's incident report noted that the inmates became more aggressive towards each other, striking their closed fists into the palms of their hands and continuing to verbally threaten each other. When McLaughlin returned with the tear-gas gun and a camera, the inmates became less aggressive but continued to threaten each other, shouting that they should "handle this right now."

3

One inmate reportedly yelled that the inmates would not rack up and that the guards might as well fire the shells because, as soon as the guards left, the inmates would fight. Waller again ordered the inmates to rack up, but the inmates still refused to comply.

Waller then left the dormitory to seek authorization to use the tear-gas gun on the inmates, temporarily handing over the gun and shells to Sergeant Reginald Murray. The Department's Use of Force plan states that "[t]he highest-ranking shift supervisor on duty shall decide if a chemical agent shall be used to gain compliance." That person was Duty Warden Major Bridgette Hayes. Waller called Hayes, and the two discussed the incident for approximately fifteen to twenty minutes. Hayes ultimately authorized and instructed Waller to use the tear-gas gun and shells if the inmates refused to comply after two more orders. Waller testified that, if an officer has "authorization to use the [37mm tear-gas gun], it is implied that munition is going to be used with it."

After Hayes authorized Waller's use, Waller returned to the area outside the dormitory shortly after 11:20 p.m. The inmates had continued to threaten each other in Waller's absence. Once Waller arrived at the area outside the dormitory, he reclaimed the tear-gas gun and shells from Murray and loaded the skat shell into the tear-gas gun. After turning on the camera to document his next actions, he stated that he would give two orders and, if the inmates still refused to comply, he would shoot the tear-gas gun. He and a few other Department employees entered the dormitory, where several other employees were standing. The two groups of inmates stood on opposite sides of the room, having still not returned to their bunks.

Waller gave his first order for the inmates to return to their bunks and warned that, if the inmates did not comply, he would use the tear-gas gun and shells to gain compliance. The other

4

Department employees in the dormitory then repeated the order, yelling "Rack it up!" several times. At that point, most of the Group B inmates returned to their bunks, but the Group A inmates did not. Waller then approached the Group A inmates, and they moved away from the door. As the Group A inmates moved towards the dormitory's bathroom, the other Department employees continued to yell "Rack it up!" Waller ordered the Group A inmates a second time to rack up, but they did not.

Waller then approached the noncomplying inmates. He gave two more orders to rack up, but again the inmates did not comply. Waller then raised the weapon and fired. The skat shell hit one of the inmates, Cesar Rangel, in his chest and hand. As the smoke spread throughout the dormitory, the Department employees ordered the inmates to lie down on the ground, and they complied. After the gas in the dormitory cleared, the Department employees placed the Group A inmates in hand restraints and escorted them out of the dormitory. Rangel suffered burns and a fractured hand as a result of the incident.

The Department conducted an internal use-of-force review that "revealed several mistakes" as to how the incident was handled, noting that the skat shell was "designed for outdoor areas" only and "that chemical agents should have been administered through the door rather than in the middle of the housing area." Following the review, the Department disciplined Waller for his actions, placing him on administrative leave for ten months.

Rangel filed suit against the Department.[1] In his live petition, Rangel alleged that the Department is liable for breaching its duty to Rangel by "(i) dispensing the skat shell in response

_____

[1] Rangel also named McLaughlin, Murray, and Waller as defendants, asserting excessive force claims under 42 U.S.C. § 1983 against each. The trial court granted summary judgment in favor of McLaughlin and Murray,

5

to an indoor situation, (ii) keeping the skat shell in a defective, unlabeled condition, and (iii) approving Lt. Waller's use of force." The Department filed a plea to the jurisdiction, no-evidence motion for summary judgment, and traditional motion for summary judgment. In each of those pleadings, the Department asserted that its sovereign immunity had not been waived for Rangel's claims against the Department. Rangel filed a joint response, asserting that the Department's negligent use of the tear-gas gun and skat shell caused his damages, that the Tort Claims Act's intentional-tort exception did not apply because it was the Department's actions—not Waller's—that were the subject of Rangel's negligence claim against the Department, and that a fact question existed as to whether the Act's emergency and riot exceptions applied to bar his claims. The trial court denied the Department's plea to the jurisdiction, and the Department filed an interlocutory appeal.[2]

The court of appeals affirmed. 581 S.W.3d 313, 324 (Tex. App.—Houston [1st Dist.] 2018). The court first held that, under section 101.021 of the Tort Claims Act, the Department "used" the tear-gas gun and skat shell because it "furnished tangible personal property that, when used for the specific purposed intended, caused Rangel's injury." *Id.* at 320. As such, the court held that Rangel alleged a claim for which the Act waives the Department's immunity, absent any applicable exception to that waiver.[3] *Id.*

---

dismissing the claims against them with prejudice. The record does not reflect the status of Rangel's claim against Waller, but that claim is not at issue here.

[2] As the court of appeals noted, the record reflects that the trial court did not rule on the Department's no-evidence and traditional motions for summary judgment. 581 S.W.3d 313, 316 n.2 (Tex. App.—Houston [1st Dist.] 2018). Thus, those motions were not the subject of the Department's interlocutory appeal and are not subject to our review here.

[3] Because it concluded that Rangel alleged a use of tangible personal property that waived the Department's immunity under section 101.021(2) of the Tort Claims Act, the court of appeals declined to address "whether Rangel also alleged a defective condition of personal property or a failure by [the Department] to follow policy." *Id.* at 320.

The court of appeals then concluded that none of the Tort Claims Act's exceptions to a waiver of immunity apply. *Id.* at 321, 324. The court examined three potential exceptions asserted by the Department: (1) the intentional-tort exception under section 101.057(2); (2) the riot exception under section 101.057(1); and (3) the emergency exception under section 101.055(2).[4] The court concluded that the intentional-tort exception does not apply because the Department's alleged act "is distinct from the intentional tort pleaded" against Waller, as the Department's negligence in providing and ordering the use of the tear-gas gun and shell was distinct from Waller's alleged excessive force. *Id.* at 321. As to the riot and emergency exceptions, the court concluded that "there is a disputed, material fact regarding the jurisdictional issue of whether an emergency or riot existed at the time of Rangel's injury." *Id.* at 323. The court explained that, while the evidence shows that the two groups of inmates refused to return to their bunks, engaged in an extended verbal altercation, threatened to fight each other, and failed to comply with orders even when warned of a potential chemical discharge, the record also indicated that Waller and Hayes spent fifteen to twenty minutes discussing the situation, that none of the inmates committed an act of violence towards each other or Department employees, and that a factfinder watching the video of the incident could reasonably conclude that no emergency or riot took place. *Id.* at 323–

---

Because we agree with the court of appeals' conclusion on the waiver's "use" prong, we likewise decline to address the "condition" prong.

[4] The intentional-tort exception provides that the Act does not waive a governmental unit's immunity for a claim "arising out of assault, battery, false imprisonment, or any other intentional tort." TEX. CIV. PRAC. & REM. CODE § 101.057(2). The riot exception provides that the Act does not waive a governmental unit's immunity for a claim "based on an injury or death connected with any act or omission arising out of . . . riot." *Id.* § 101.057(1). And the emergency exception provides that the Act does not waive a governmental unit's immunity for a claim arising:

> from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others . . . .

*Id.* § 101.055(2).

24. The court thus concluded that "the evidence presented does not prove the existence of an emergency or a riot as a matter of law" but instead raises a "disputed jurisdictional fact issue" for the factfinder to resolve. *Id.* at 324.

Having determined that the Department failed to conclusively demonstrate any of the Act's exceptions to a waiver of immunity, the court of appeals held that the trial court did not err in denying the Department's plea to the jurisdiction. *Id.* We then granted the Department's petition for review.

## II. Standard of Review

Sovereign immunity implicates a trial court's subject matter jurisdiction and "thus is properly asserted in a plea to the jurisdiction." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea to the jurisdiction "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). If a plea "challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Miranda*, 133 S.W.3d at 226. In determining whether the plaintiff has met that burden, "we liberally construe the pleadings, taking all factual assertions as true and looking to [the plaintiff's] intent." *City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015).

But when a plea to the jurisdiction challenges the existence of jurisdictional facts, we look beyond the pleadings and consider evidence submitted by the parties "when necessary to resolve the jurisdictional issues raised," even if the evidence implicates both the court's jurisdiction and the merits of a claim. *Miranda*, 133 S.W.3d at 227. For a plea that challenges the existence of jurisdictional facts, our standard of review generally mirrors that of a traditional summary

8

judgment: a plaintiff must raise a genuine issue of material fact to overcome the challenge to the trial court's jurisdiction. *Id.* at 221, 228. In determining whether the plaintiff has met that burden, "we take as true all evidence favorable to" the plaintiff and "indulge every reasonable inference and resolve any doubts in the [plaintiff's] favor." *Id.* at 228. If the evidence and allegations create a fact question regarding jurisdiction, then a court cannot grant a plea to the jurisdiction, and the factfinder must resolve the fact issue. *Id.* at 227–28. But "if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue," a court rules "on the plea to the jurisdiction as a matter of law." *Id.* at 228.

### III. Discussion

### A. Use of Tangible Personal Property

We first determine whether Rangel asserted a claim for which the Act waives the Department's immunity, at least absent any applicable exceptions. A governmental unit may be sued if the Legislature has waived its immunity with clear and unambiguous language. *Harris County v. Annab*, 547 S.W.3d 609, 613 (Tex. 2018). Under the Tort Claims Act's immunity waiver, a governmental unit can be liable for certain injuries proximately caused by the "negligence or a wrongful act or omission of an officer or employee acting within the scope of his employment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 513 (Tex. 2019). As relevant here, the waiver encompasses claims for "personal injury . . . so caused by a . . . use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(2).

9

In examining what constitutes "use" of tangible personal property for purposes of the Act's waiver, we have held that a governmental unit "does not 'use' personal property merely by allowing someone else to use it and nothing more." *Annab*, 547 S.W.3d at 613 (quoting *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004)). Instead, relying on the plain and ordinary meaning of the words the Legislature chose, we have held that a governmental unit "uses" tangible personal property if it puts or brings the property into action or service, or employs the property for or applies it to a given purpose. *McKenzie*, 578 S.W.3d at 513; *Annab*, 547 S.W.3d at 613; *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 388 (Tex. 2016). Further, the government's use of the property "must have actually caused the injury." *Sampson*, 500 S.W.3d at 388–89 (quoting *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 588 (Tex. 2001)).

The parties dispute whether the Department "used" tangible personal property under section 101.021(2). Rangel argues that, by providing, authorizing, and instructing Waller to use the tear-gas gun and skat shell for a given purpose, the Department used the tear-gas gun and skat shell under section 101.021(2). The Department disagrees, arguing that verbal authorization is not a use of property.

We agree with the court of appeals that the Department "used" the tear-gas gun and skat shell when Hayes authorized and instructed Waller to use them to address the incident in the prison dormitory. As the court noted, Department employees "gave the prison guard the [tear-gas] gun and skat shell for the express purpose of using it to control the situation with the inmates." 581 S.W.3d at 318. In doing so, the Department did not simply make available the tear-gas gun and skat shell to Waller; rather, the Department "put" the tear-gas gun and skat shell into "action or service" and "employ[ed]" them for the "given purpose" of addressing the incident with the

10

inmates. *Annab*, 547 S.W.3d at 613 (citation omitted). Where, as here, a governmental unit authorizes or orders an employee to use tangible personal property for a specific purpose, that governmental unit has "used" the tangible personal property for purposes of the Act's waiver.

This understanding of "use" comports with our longstanding interpretation of the term. Again, we have interpreted "use" to include employing tangible personal property for a given purpose or putting it into service or action. *See, e.g.*, *Cowan*, 128 S.W.3d at 246 (noting that "since 1973 we have consistently defined 'use' to mean 'to put or bring into action or service; to employ for or apply to a given purpose'") (quotation omitted). By authorizing and ordering Waller to use the tear-gas gun and skat shell, Hayes (and, through her, the Department) did just what we have long held to constitute "use": the Department employed the tear-gas gun and skat shell for a given purpose, or put the tear-gas gun and skat shell into service or action. This is also consistent with precedent from several courts of appeals holding that, by ordering the use of tangible personal property for a given purpose, a governmental unit's employee has "used" the property under section 101.021. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. Jones*, 485 S.W.3d 145, 151 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("By giving Jones the drug and directing her to take it for the purposes of quitting smoking and conducting its study, UTMDA put the drug into service and employed it for a given purpose as those concepts are commonly understood."), *cited in McKenzie*, 578 S.W.3d at 515–16; *Tex. State Tech. Coll. v. Beavers*, 218 S.W.3d 258, 267 (Tex. App.—Texarkana 2007, no pet.) (noting that a governmental unit "uses" tangible personal property when it "negligently equips the property," "puts it into service for use by another with full knowledge of its intended use," and "instructs the manner of its use").

Further, holding that the Department's actions constitute "use" of tangible personal property comports with the plain language of the statute. We have interpreted "use" under section 101.021 as a "common, everyday word[]." *PHI, Inc. v. Tex. Juvenile Justice Dep't*, ___ S.W.3d ___, ___ (Tex. 2019). As such, our interpretation of "use" is consistent with the ordinary meaning of the word. *Compare id.* (defining "use" as "to put or bring into action or service; to employ for or apply to a given purpose"), with *Use*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) (defining "use" as "to put into action or service" and "employ"). And, as we have noted, the ordinary meaning of "use" includes to "employ," which means "to make use of" or "to use or engage the services of." *Employ*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Thus, the plain meaning of "use" does not necessarily require physical manipulation of an object. *See Tex. Dep't of Criminal Justice v. Campos*, 384 S.W.3d 810, 815 (Tex. 2012) (indicating that "[u]sing . . . cameras for surveillance," as opposed to merely deciding where to place the cameras for future use, constitutes "use" under the Act because doing so "put[s] or bring[s] them into service or employ[s] or appl[ies] them to a given purpose").

The Act's distinction between "use" and "operation" further supports this understanding of "use." *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1) (waiving sovereign immunity with respect to injuries arising from the "operation or use" of a motor vehicle). While we have interpreted "operation" to mean "a doing or performing of a *practical* work," we have understood "use" as having a broader definition—again, "to put or bring into action *or service*; to *employ* for or apply to a given purpose." *PHI*, __ S.W.3d at ___ (emphasis added). Thus, because the Department employed the tear-gas gun and skat shell for a given purpose, it has "used" the property under section 101.021(2).

12

The Department argues that our analysis in *Annab* forecloses the conclusion that the Department "used" the tear-gas gun and skat shell here. In *Annab*, a deputy constable shot the plaintiff, who sued the county that employed the constable. 547 S.W.3d at 611. The plaintiff argued that the county used the tangible personal property (the firearm) when the constable shot the plaintiff. *Id.* As we noted in that case, the plaintiff in effect alleged that the county's "use" of tangible personal property stemmed from its making "the firearm available to" the deputy constable by providing general authorization for his use of the firearm. *Id.* at 613. On those facts, we held that the plaintiff's allegation that the county generally "enabled, authorized, or approved [the deputy constable's] use of the firearm [did] not amount to an allegation that the county used the firearm." *Id.*

But *Annab* is readily distinguishable from this case. Critically, in *Annab*, the county gave no instruction or order to the deputy constable regarding the use of the firearm during the incident in which the plaintiff was injured. Instead, the county simply "made the firearm available" to the deputy constable by generally approving its use. *Id.* Here, by contrast, the Department authorized Waller to use the tear-gas gun and skat shell specifically in response to the incident in the dormitory. Further, while the deputy constable in *Annab* was off duty at the time he shot the plaintiff and fired his personal firearm, *id.* at 611, here Waller was on duty and shot a weapon provided by the Department to respond to a particular situation. In sum, here, the governmental unit put the property into service and employed it for a given purpose; in *Annab*, the governmental unit did neither. *Id.* Thus, the Department "used" tangible personal property under section 101.021(2).

13

## B. Riot Exception

Although Rangel's claims against the Department fall within the scope of section 101.021(2)'s immunity waiver, the Department also argues that several of the Act's exceptions to the waiver apply. *See City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 (Tex. 2006) (noting that the Act provides a few exceptions "in which its waiver provisions do not apply"). We hold that the evidence conclusively demonstrates the applicability of one of those exceptions—the so-called riot exception—and that the Department is thus entitled to dismissal.[5]

Under the riot exception, the Act's immunity waiver does not apply to a claim "based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion." TEX. CIV. PRAC. & REM. CODE § 101.057(1). Where allegations and evidence, when taken in the light most favorable to the nonmovant, do not create a fact issue as to the existence of a riot, we may determine whether the riot exception applies as a matter of law. *See Miranda*, 133 S.W.3d at 228.

The parties dispute whether a riot existed here. Rangel argues that the circumstances did not constitute a riot under the ordinary meaning of the term. Further, Rangel asserts that, even if the circumstances *could* constitute a riot, a factual dispute remains as to whether there *was* a riot, thereby requiring that the factfinder resolve the issue. The Department disagrees with both of Rangel's arguments, contending that the undisputed jurisdictional facts establish a riot as a matter of law.

Resolution of this issue turns on the meaning of "riot." The Act does not define what constitutes a riot, so we interpret the term according to its ordinary meaning, *see* TEX. GOV'T CODE

---

[5] We need not and do not decide whether the emergency and intentional-tort exceptions apply.

14

§ 312.002, as we have done for other undefined terms in the Act, *PHI*, ___ S.W.3d at ___ (interpreting "use" and "operation" in the Act according to their ordinary meanings). We typically "look first to dictionary definitions" to "determine a term's common, ordinary meaning." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). Black's Law Dictionary defines "riot" as an "unlawful disturbance of the peace by an assemblage of usu[ally] three or more persons acting with a common purpose in a violent or tumultuous manner that threatens or terrorizes the public or an institution." *Riot*, BLACK'S LAW DICTIONARY (11th ed. 2019). Similarly, Webster's Dictionary defines "riot" as "a tumultuous disturbance of the public peace by three or more persons assembled together and acting with a common intent." *Riot*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).

To determine a term's ordinary meaning, we may also "consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017). To that end, the Penal Code provides its own definition of "riot" in making it a criminal offense to knowingly participate in one. TEX. PENAL CODE § 42.02.[6] The Department urges us to utilize that definition here. However, Rangel argues that the Penal Code should not guide our analysis, as the Tort Claims Act

---

[6] Section 42.02 of the Penal Code provides:

(a) For the purpose of this section, "riot" means the assemblage of seven or more persons resulting in conduct which:

    (1) creates an immediate danger of damage to property or injury to persons;

    (2) substantially obstructs law enforcement or other governmental functions or services; or

    (3) by force, threat of force, or physical action deprives any person of a legal right or disturbs any person in the enjoyment of a legal right.

(b) A person commits an offense if he knowingly participates in a riot.

TEX. PENAL CODE § 42.02(a)–(b).

does not reference the Penal Code and section 42.02 states that its definition is "[f]or the purpose of *this section*." *Id.* (emphasis added). The court of appeals agreed with Rangel, noting that "[t]he legislature could have incorporated the Penal Code's definition of 'riot' by reference, or it could have added those words of the definition to the [Act], but it did not." 581 S.W.3d at 322 n.4.

While we agree that the Act does not expressly import the Penal Code's definition of "riot," that definition does provide us guidance insofar as it is consistent with the term's ordinary meaning. We have noted that the purpose of the riot exception is, in part, to exclude liability for any injuries occurring as a result of law enforcement efforts to control riots. *State v. Terrell*, 588 S.W.2d 784, 786–87 (Tex. 1979). In determining whether circumstances constitute a riot, law enforcement officials necessarily rely on the Penal Code's definition. Thus, in line with the riot exception's purpose, the Act precludes a waiver of sovereign immunity when a law enforcement official responds to a "riot"—again, at least as far as the Penal Code's definition is consistent with the ordinary meaning of the term. *See id.*

The Penal Code defines "riot" in part as "the assemblage of seven or more persons resulting in conduct" that "creates an immediate danger of damage to property or injury to persons." TEX. PENAL CODE § 42.02(a). While not identical, that definition comports with the ordinary meaning of "riot," emphasizing not only the size of assemblage and nature of the events but also the immediate danger that those events present to people nearby and to law enforcement officials' ability to respond to that danger. Thus, taken together, the dictionary definitions and Penal Code indicate that, under section 101.057(1), a riot is a disturbance of the peace by an assemblage of seven or more persons acting with a common purpose in a tumultuous manner that

16

immediately threatens or terrorizes the public or an institution. Determining whether a riot exists necessarily requires examining the totality of the facts and circumstances.

The Department argues that, rather than focusing on the ordinary meaning of the term, we must accord deference to prison officials in determining whether a riot exists. But the Department points to no statutory authorization for such deference. In construing a statute, we "first look to the statute's plain language," and "[i]f that language is unambiguous, we interpret the statute according to its plain meaning." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015). We "may not impose [our] own judicial meaning on a statute by adding words not contained in the statute's language," and we presume that "the Legislature purposefully omitted words it did not include." *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019); *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 665 (Tex. 2019) ("But no court, including this one, can alter or augment statutory text by announcing tests to aid the application of the statute."). Here, nothing in the plain language of section 101.057(1) indicates that our understanding of what constitutes a riot defers to a prison official's judgment. "Had the Legislature intended to" allow such deference to prison officials, "it could have easily added language to that effect," but it did not. *Lippincott*, 462 S.W.3d at 509. In the absence of any statutory authorization of such deference, we determine whether there is a riot as it is understood according to its ordinary meaning. *Silguero*, 579 S.W.3d at 59; *PHI*, ___ S.W.3d at ___.

Based on the "undisputed evidence of jurisdictional facts," *Miranda*, 133 S.W.3d at 226, the circumstances here constituted a "riot" as a matter of law. To be clear, an inmate's noncompliance with official orders, by itself, does not necessarily constitute a riot. Nor do threats between inmates necessarily constitute a riot. But the facts here go beyond noncompliance and

17

threats. Both groups of inmates refused to return to their bunks for almost an hour despite Department employees explicitly ordering them dozens of times over that span to rack up. Inmates from each group threatened each other throughout this time, yelling at each other, making violent gestures to each other, and stating that, regardless of whether they racked up, there would be a fight between the groups. The groups each consisted of thirteen inmates, resulting in multiple calls for backup. As an interim step, Waller and other Department employees displayed the 37mm tear-gas gun as a show of force for over thirty minutes. After being authorized and instructed to use the tear-gas gun, Waller also warned the inmates that he would fire it if they refused to comply, ordering them to return to their bunks four more times before firing. Meanwhile, the other Department officials in the dormitory repeatedly ordered the inmates to rack up. Despite those measures, the inmates still did not comply and continued to threaten each other. Taken together, the facts amount to a riot.[7] And as no evidence raises a material question as to these facts, we hold that, based on the totality of circumstances, a riot existed as a matter of law.

Rangel argues that the circumstances here did not constitute a riot because of the length of time during which the events unfolded. Rangel asserts that the protracted nature of the incident afforded the Department employees time to deliberate, as evidenced by Hayes's and Waller's discussion before she authorized the tear-gas gun's use. But the duration of an event does not necessarily undermine whether there is an immediate threat. Here, tensions generally continued to heighten in the prison dormitory for almost an hour, with the inmates—grouped into opposing factions of thirteen members each—continuously making threats against each other. Despite dozens of orders by Department employees, the inmates refused to return to their bunks and

---

[7] We note that, here, the Department used non-lethal means to respond to the riot.

18

continued to threaten each other. Thus, the riot persisted and even escalated throughout that time, and Waller and Hayes deliberated on how to respond. The time spent deliberating, while the riot was occurring, is not evidence that the Department was no longer responding to one.

Because Rangel has failed to provide any proof that would "raise a fact question on the jurisdictional issue" of whether there was a riot, we conclude that the riot exception applies as a matter of law. *Miranda*, 113 S.W.3d at 228. Accordingly, the Tort Claims Act does not waive the Department's immunity.

## IV. Conclusion

Although under the Tort Claims Act the Department used the tear-gas gun and skat shell when it authorized and instructed Waller to use them for a given purpose, we hold that the Act's riot exception applies as a matter of law and forecloses waiver of the Department's immunity. Accordingly, we reverse the court of appeals' judgment and dismiss Rangel's claims against the Department for lack of jurisdiction.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** February 7, 2020